IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
OXFORD DIVISION

GREG WINTER, INDIVIDUALLY,
AND ON BEHALF OF ALL WRONGFUL
DEATH BENEFICIARIES
OF LATACIA WINTER, DECEASED                                    PLAINTIFF

v.                                          CIVIL ACTION NO. 3:23-CV-352-SA-RP

TYRIN COWART AND DT FREIGHT, LLC                              DEFENDANTS

ORDER AND MEMORANDUM OPINION

The parties have filed numerous Motions [72, 78, 80, 82, 86, 88, 90, 92] seeking to exclude or limit certain anticipated trial testimony of expert witnesses. The Court has reviewed the filings, along with the applicable authorities, and is prepared to rule.

*Relevant Background*

This lawsuit stems from a fatal motor vehicle accident. The collision occurred on August 19, 2021, just prior to 6:00 AM on US Highway 72 in Marshall County, Mississippi. For reference, US Highway 72 is a four-lane highway with two lanes of eastbound traffic and two lanes of westbound traffic.

On the date in question, Tyrin Cowart was traveling westbound on US Highway 72 in a tractor trailer. Although not an employee of DT Freight, Cowart was hauling a load for that entity. Cowart parked his tractor trailer on the right shoulder of the highway to check the load on his flat-bed trailer. Latacia Winter was also traveling westbound on US Highway 72 in a minivan on her way to work.

The collision between the two vehicles occurred when Cowart merged his truck back onto Highway 72 from the right shoulder where he had been parked. Winter's minivan collided with

the back of Cowart's trailer. The collision occurred in the right lane of westbound traffic. Winter died at the scene.

This lawsuit followed. Greg Winter—Latacia Winter's husband—brings the case on behalf of himself and all wrongful death beneficiaries. Winter contends that Cowart acted negligently in multiple ways, such as failing to keep and maintain a proper lookout, failing to keep his vehicle under control, failing to maintain a proper distance from other vehicles, willfully disregarding the safety of others, failing to yield the right of way, failing to comply with the Federal Motor Carrier Safety Regulations and the applicable law, among others. As to DT Freight, Winter asserts vicarious liability claims.

The present filings concern substantial portions of anticipated expert testimony. The parties seek to strike or significantly limit testimony that they anticipate the opposing side will present.

### Standard for Expert Testimony

The admission or exclusion of expert witness testimony is left to the discretion of the district court. *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152, 119 S. Ct. 1167, 143 L. Ed. 2d 238 (1999); *United States v. Wen Chye Liu*, 716 F.3d 159, 167 (5th Cir. 2013). Rule 702 of the Federal Rules of Evidence governs expert witness testimony and provides as follows:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and

> (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

FED. R. EVID. 702.

"Prior to admitting expert testimony, district courts must be assured that the proffered witness is qualified to testify by virtue of his knowledge, skill, experience, training, or education. Accordingly, to qualify as an expert, the witness must have such knowledge or experience in his field or calling as to make it appear that his opinion or inference will probably aid the trier in his search for truth." *EEOC v. Modern Grp., Ltd.*, --- F. Supp. 3d ---, 2024 WL 1290450, at *3 (E.D. Tex. Mar. 25, 2024) (quoting *Wellogix, Inc. v. Accenture, L.L.P.*, 716 F.3d 867, 881 (5th Cir. 2013); *United States v. Hicks*, 389 F.3d 514, 524 (5th Cir. 2004)) (additional citations and quotation marks omitted).

The proponent of the testimony bears the burden to establish its admissibility by a preponderance of the evidence. *Id.* (citations omitted). "The proponent need not prove to the judge that the expert's testimony is correct, but she must prove by a preponderance of the evidence that the testimony is reliable." *Sandifer v. Hoyt Archery, Inc.*, 907 F.3d 802, 809 (5th Cir. 2018).

*Analysis and Discussion*

The Court will address each of the subject Motions [72, 78, 80, 82, 86, 88, 90, 92] in turn.

I.      *Plaintiff's Motion to Exclude Joshua Allen [72]*

The Defendants have disclosed Mississippi Highway Patrol Officer Joshua Allen as a non-retained expert who will testify in this case. In their expert disclosures, the Defendants state as follows regarding Trooper Allen's proposed testimony:

> Trooper Allen investigated the accident for the Mississippi Highway Patrol and prepared a Crash Report. To the extent called as a witness, it is anticipated that his testimony would be primarily factual in nature, but to the extent he has opinions regarding the accident, it is expected those would be consistent with what is set

3

> forth in his report Case # 9047030819210002 including but not being limited to his conclusion that Ms. Winter was distracted by manually operating a device (e.g. texting, dialing, playing game, etc.) and that the distraction source was a hand-held mobile phone. It is anticipated that the basis for Trooper Allen's factual as well as potentially his opinion testimony would be based on his investigation of the accident as well as his observations at the accident scene, including but not being limited to his observations of the physical evidence in the roadway, the vehicles, and the cell phone in Ms. Winter's vehicle.

[72], Ex. 2 at p. 6-7.

Winter contends that Trooper Allen is not qualified to provide any expert opinions on accident reconstruction or causation. He further argues that "there is no indication that Trooper Joshua Allen possesses the necessary knowledge, skill, experience, training, or education under Fed. R. 702 to offer the opinions contained in his proposed testimony or in the accident report. The fact that Allen has responded to other accidents does not authorize him to testify as an expert accident reconstructionist, either on the stand or in the accident report." [73] at p. 23.

In their Response Memorandum [100], the Defendants "acknowledge that Trooper Allen is not an accident reconstructionist, and have not designated him as such." [100] at p. 3. Instead, they assert that the pertinent question "becomes whether Trooper Allen would be considered an expert under Fed. R. Ev. 702 due to his specialized training and knowledge in investigating motor vehicle crashes." *Id*. In other words, the Defendants draw a distinction between an accident reconstructionist and an accident investigator.

In a 2019 case, the Fifth Circuit considered whether a district court abused its discretion in allowing an officer (Smith), who was the first responder to the accident and saw it occur from afar, to provide an opinion on causation. *See Puga v. RCX Solutions, Inc.*, 922 F.3d 285, 294-95 (5th Cir. 2019) (citations omitted). Ultimately, the Fifth Circuit concluded:

> The district court did not abuse its discretion in allowing Smith to offer an expert opinion on the cause of the accident—Smith considered an appropriate amount of physical evidence at the scene of the crime to offer his opinion, and [the defendant] had an ample opportunity to show the jury any flaws in his opinion.
>
> No Fifth Circuit case applies Rule 702 and *Daubert* to an accident investigator. But the majority of in-circuit district courts choose to admit accident investigators as experts. District courts use a contextual analysis when making this determination, looking to see if the investigating officer bases his opinion on a sufficient amount of physical evidence from the accident.

*Id.* (citations omitted).

Considering this overarching standard and the facts of the case *sub judice*, the present Motion [72] is premature. Trooper Allen investigated the accident and made certain observations at the scene. Notably, Winter did not depose Trooper Allen. Therefore, the Court has not been provided any evidentiary support as to the basis for his opinions. This makes it particularly difficult for the Court to assess the issue "us[ing] a contextual analysis when making this determination, looking to see if the investigating officer basis his opinion on a sufficient amount of physical evidence from the accident." *Puga*, 922 F.3d at 294-95. The Court simply has no way to engage in that analysis with the information that has been presented at this time.

The Court will permit the Defendants to attempt to establish the requisite foundation for Trooper Allen's testimony at trial and then determine the extent to which Trooper Allen will be permitted to testify as an expert. The parties shall notify the Court prior to the elicitation of any causation testimony from Trooper Allen so that the Court may, if appropriate, consider the matter as a proffer outside of the presence of the jury.

To the extent Winter seeks to categorically exclude Trooper Allen from testifying, the Motion [72] is DENIED.

II.    *Plaintiff's Motion to Strike Joshua Lorencz [78]*

The Defendants have designated Joshua Lorencz as a "Digital Forensics Examiner retained by the Defendants to inspect and access data from the iPhone provided by plaintiff for examination, and to offer opinions regarding the results of his examination and the data obtained." [78], Ex. 1 at p. 4. Lorencz prepared an initial report and a supplemental report.

In his initial report, he explains that he extracted data from Latacia Winter's phone from the date of the accident. The report then sets forth a timeline analysis "of activities taking place on the phone." [78], Ex. 2 at p. 4. The timeline begins at 5:06 AM (before Winter left her home) until her phone battery died at 2:27 PM that afternoon. Lorencz reached the following conclusions:

> Based upon my analysis of the iPhone 8 plus and my review of the Mississippi Uniform Crash Report, I was able to form opinions regarding certain user interactions with the device prior to the accident. Latacia Winter took a video of her Koi fish tank at 5:06:03 AM. An Apple Map trip was started while driving at 5:09:17 AM. The Apple Maps application ended at 5:38:59 AM. The Amazon application was launched by touching the application button on the home screen at 5:39:05 AM. The application launch was documented via a Springboard transition entry. At that time the device was traveling at 68.9 MPH. Once the application was launched, images started to cache to the phone from 5:39:08 AM until 5:39:20 AM. The act of the images caching is a function of the operating system on the phone. The action is triggered because of the images being presented on the device screen. This is indicative of user interaction with the device. The progression from Amazon based ads to specific products is indicative of the user manipulating the application on the phone. Some of the images were related to pond cleaning, water filtering, Koi fish food, and Microbe lift which can be used in aquariums. The device was traveling at approximately 69 MPH during these events while Latacia Winter was interacting with her device. At 5:39:26 AM, the device GPS location is within the horizontal accuracy of the final position of rest for the device.
>
> . . .
>
> I formed the opinion that Latacia Winter was actively manipulating her device within 6 seconds of the collision.

*Id*. at p. 5-6.

In his request to limit Lorencz's testimony, Winter argues that "Lorencz formed his opinions without employing a reliable methodology or principles that are supported in science." [79] at p. 7. Winter emphasizes that, when asked in his deposition how he reached his conclusion, Lorencz testified: "Well, I don't think there would be a scientific formula." [79] at p. 7 (citation omitted). Winter goes on to contend that "Lorencz's opinions should be excluded because they are (1) speculation and (2) based on inadmissible hearsay." *Id*. at p. 8.

The second argument is easily disposed of so the Court will address it first. Winter contends that Lorencz impermissibly relied on the accident report in forming his opinions. According to Winter, the accident report constitutes inadmissible hearsay and therefore "Lorencz cannot rely on [it] in forming his opinions." *Id*. at p. 28. "An expert may rely on otherwise inadmissible facts and data if experts in the particular field would reasonably rely on such evidence." *Hebert v. Prime Ins. Co.*, 459 F. Supp. 3d 766, 774 n. 2 (W.D. La. 2020) (quoting *Sandifer v. Hoyt Archery, Inc.*, 907 F.3d 802, 808 (5th Cir. 2018)). Whether Lorencz relied on inadmissible hearsay does not, at least at this stage in the proceedings, constitute an appropriate basis to exclude his testimony.

The Court now turns to Winter's first argument—that Lorencz's opinion is speculative. Winter's argument on this point is as follows:

> Lorencz's opinion is speculative because although he downloaded and reviewed the phone's data, the data in and of itself does not indicate if Winter's cell phone [was] in her hand or if she was looking at her phone. The data does not prove Winter physically manipulated the phone. No one was present in Winter's vehicle to observe whether she was holding or touching her cell phone. There is no evidence to support this conclusion without a leap of speculation.

[79] at p. 8.

In response, the Defendants frame the issue this way:

> Plaintiff's brief in support of this Motion concedes that somehow (either on purpose or by an accidental "pocket dial") one iPhone app was closed and another opened within thirty (30) seconds of the collision. Plaintiff's designated cell phone expert agrees that images were displayed on the phone and artifacts were saved on the phone as close as six seconds before the collision. The central dispute between the dueling cell phone experts here concerns interpretation of the data. Specifically, the issue is interpretation of the data showing the Maps app was closed, the Amazon app was opened, and certain images were "cached" or stored on the phone. Everyone agrees these events occurred. The dispute relates to how and why they occurred and what conclusions can be reasonably drawn from the technical data. Mr. Lorencz concludes, based on the extracted data, it is more likely than not Mrs. Winter was actively or intentionally interacting with or manipulating her phone to cause these data artifacts. Mr. Wood says it is equally possible the artifacts exist due to accidental contact between some part of Mrs. Winter's body and the phone.

[98] at p. 2.

Of importance to this Court is the fact that Winter does not criticize the method by which Lorencz downloaded or extracted the underlying data. Rather, Winter takes issue with the conclusion that Lorencz drew from the data. However, Lorencz's supplemental report explains that his conclusion is based upon his experience and testing.

"In determining the admissibility of expert testimony, the district court should approach its task with proper deference to the jury's role as the arbiter of disputes between conflicting opinions." *Pettway v. Asian Tire Factory Ltd.*, 2021 WL 5074658, at *1 (S.D. Miss. Oct. 15, 2021) (quoting *United States v. 14.38 Acres of Land*, 80 F.3d 1074, 1077 (5th Cir. 1996)). Lorencz has extensive qualifications and has explained that his experience and testing assisted him in reaching his conclusions. Winter will certainly be permitted to cross-examine Lorencz to emphasize the perceived deficiencies with Lorencz's opinions, but the Court sees no need to strike or limit his testimony based on the arguments presented at this time. The Motion [78] is DENIED.

III.     *Defendants' Motion to Exclude Opinions of Kyle Wood [90]*[1]

In his supplemental designation, Winter identifies Wood as "an expert in the fields of forensic data recovery, digital phone examination, computer engineering, and [] an IT specialist." [78], Ex. 9 at p. 1. Wood's proposed testimony, as set forth in the supplemental designation, is as follows:

> Kyle Wood is anticipated and/or expected to testify regarding Latacia Winter's phone. Mr. Wood is anticipated and/or expected to testify in line with his report provided to Plaintiff. Kyle Wood is expected to testify that the data recovered from the cell phone and the cell phone provider indicates that Ms. Winter was not using her phone to scroll through the Amazon app, was not talking on the phone, and was not texting on the phone in the moments before the wreck. Regarding Defendants' claim that Latacia Winter was looking at her phone or holding her phone at the time of the automobile accident, Mr. Wood is anticipated and/or expected to testify there is no data retrieved from the phone that would be able to determine this information. He is anticipated and/or expected to testify the phone data only shows when an app is opened but does not show if the user was actively manipulating the phone. He will also testify that [] ability to determine the difference between data usage when a driver has an app open and on the seat next to them and when a driver is physically looking at and using the phone is not contained in the downloaded data. He will also testify that his review of the phone data indicates that unless there is direct testimony of the actions of the cell phone user at the time of the event, an expert in this case cannot determine if the phone was being used, only that the phone was active or non-active.

*Id.* at p. 2.

In his report, Wood relies on the same underlying phone data as Lorencz. However, he disagrees as to the information that can be taken away from that data. Some of his opinions are as follows:

> The data download does not provide information to show that Ms. Winter was "actively manipulating her device" in the 6 seconds before the device stops. The download data only shows that images

---

[1] Although the Defendants' Motion [90] as to Wood was not next in order of filing, the Court finds it appropriate to address it here since it concerns the same data as the preceding section concerning Lorencz.

> and product listings from the Amazon app were caching to the phone but it does not indicate that Ms. Winter was physically scrolling through the ads and product listings. Any suggestion that is occurring is speculation as the data does not provide that detailed information.
>
> . . .
>
> It is my expert opinion that Mr. Lorencz's conclusion that Latacia Winter was actively manipulating her device within 6 seconds of the collision is speculation because this data is not provided in the iPhone data evidence. The computer program does not provide this type of information.

[90], Ex. 1 at p. 4-5.

The report goes on to explain that the Amazon app, which was the app that was open on Winter's phone at the time of the collision, "independently displayed a rotating set of ads. The user did not have to swipe the ads. The ads changed independently without user manipulation of the screen. When I inspected the cache storage on my iPhone I found that about 7-12 advertisement images from the Amazon app would cache onto my iPhone. . . This testing shows that cache images on a user's iPhone will occur without the user actively manipulating or touching the phone." *Id*. at p. 6. In his deposition, Wood testified that it is also possible that the phone was being manipulated while in Winter's pocket or that it was touched by some other part of her body. In other words, his opinion is that the data does not support Lorencz's opinion, which Wood views as speculative.

The Defendants contend that Wood is not qualified to offer expert testimony on cell phone forensics and that his opinions are not the product of reliable principles and methods.

As to qualifications, the Defendants emphasize that Wood "holds no certifications" and has "previously performed only 15-20 cellphone extractions using the Cellebrite system at issue in this case." [91] at p. 6. They also rely on Wood's deposition testimony and note "[h]is training and experience with Cellebrite is limited to YouTube courses. He has attended some seminars or

programs associated with forensic examination of cell phones but does not recall when or how many." *Id*. (internal citations omitted).

"Federal Rule of Evidence 702 requires that an expert be properly qualified. Generally, if there is some reasonable indication of qualifications, the court may admit the expert's testimony and then leave to the jury the extent of those qualifications." *Sexton v. Exxon Mobil Corp.*, 484 F. Supp. 3d 321, 333 (M.D. La. 2020) (citing *Rushing v. Kansas City S. Ry. Co.*, 185 F.3d 496, 507 (5th Cir. 1999), superseded by statute on other grounds). In addition, "Rule 702 does not mandate that an expert be highly qualified in order to testify about a given issue. Differences in expertise bear chiefly on the weight to be assigned to the testimony by the trier of fact, not its admissibility." *Id*. (quoting *Carlson v. Bioremedi Therapeutic Sys., Inc.*, 822 F.3d 194, 199 (5th Cir. 2016); *Huss v. Gayden*, 571 F.3d 442, 452 (5th Cir. 2009)).

This Court has considered Wood's testimony as to his qualifications and finds him sufficiently qualified to testify as an expert. He provided an explanation as to why he did not possess any certifications. And the Court notes that the Defendants have cited no bright line rule as to the number of cell phone extractions that an expert must perform before being qualified as an expert on cell phone forensics. The Defendants' arguments in opposition to Wood on this point go to the *weight* that a jury should assign his testimony, not its admissibility.

Concerning the principles and methods that Wood applied, the Defendants argue:

> To test his theory that the data could be explained by [an] accidental 'pocket dial' type interaction, Wood simply relied on his personal anecdotal experience with 'pocket dials.' None of this testing was scientific, it cannot be duplicated, it was not recorded nor peer reviewed. Moreover, it was performed while Mr. Wood was walking around, not sitting in a car driving. He did not even use the same phone model.

[91] at p. 7.

Winter concisely noted the point of contention between the parties as follows:

> The point of contention is Defendants' expert claims the cell phone download shows Winter actively manipulating her phone before the wreck. Plaintiff's expert, Wood, testified the cell phone download does not provide that type of information. Because Wood is qualified as a forensic recovery specialist, his testimony about what the phone holds and what information it reveals is important to help the jury understand the case.

[116] at p. 6.

One explanation Wood gives for how the data could show what it does without Winter having been actively using her cell phone is a "pocket dial" situation. He testified on this point in his deposition:

> Q.    Okay. Did you do any testing to support the conclusion that something like that could happen in the pocket in this particular case?
>
> A.    I've had it happen myself, so that --
>
> Q.    My question is, did you do any testing in this particular case?
>
> A.    Yes.
>
> Q.    Tell me about that.
>
> A.    I put it in my -- I unlocked it to simulate, since her phone was always unlocked, and I was able to navigate three pages and go into a folder. But --
>
> Q.    How?
>
> A.    Just by it being in my pocket and walking around doing -- doing appointments. I wasn't in a car. I guess I could try that. I could be in a car.
>
> Q.    But you tested it for this particular case or are you going back to your personal experience?
>
> A.    No.  I mean, once I thought this could be one of the ways, I -- well, that was one of the ideas I bounced off Mervyn was, do you think that would be possible. I mean, that's more of

12

a just -- I guess it's technical, but it's just physical. Can it happen? So I unlocked my phone, put it in my pocket. I probably didn't have these exact jeans on, but I had some jeans on to see if it would be -- because I know it has happened. I know it is possible. So me doing it now or ten years ago doesn't change the fact that it is possible.

Q.    My question, though, specific to this case?

A.    Yes, I did.

Q.    You did it with her phone?

A.    No.

Q.    You did it with your phone?

A.    Correct.

Q.    Is your phone an iPhone 8 like hers?

A.    No.

[90], Ex. 2 at p. 74-75.

Wood's testimony is that he did perform testing to support his conclusion. Although the Defendants assert concerns associated with the testing that he performed, the Court views those matters as ones that are appropriate for cross-examination, not to justify exclusion. *See, e.g.*, *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 596, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993) ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.").

The parties do not dispute the underlying data. Rather, the dueling experts dispute what precisely can be gleaned from the data. The Court finds that this should be left for the jury to decide. The Motion [90] is DENIED.

13

IV.    *Plaintiff's Motion to Exclude or Limit Testimony of Stephanie Borzendowski [80]*

The Defendants' expert disclosures identified Dr. Stephanie Whetsel Borzendowski as a "Human Factors Consultant retained by the Defendants." [78], Ex. 1 at p. 5. Borzendowski holds a doctorate in human factors psychology which she earned at Clemson University.

In her report, Borzendowski lists the documents that she considered as part of her investigation, including the pleadings, the accident report, reports of other experts, photographs, Cowart's deposition, and Winter's cell phone records. She also states that she independently reviewed sun and moon data from the United States Naval Observatory.

In the "Discussion" portion of her report, Borzendowski provides a definition for "driver distraction" which is "a division of attention away from activities crucial for safe driving toward a competing activity." [80], Ex. 1 at p. 4. The report goes on to explain "multiple resource theory" which "provides a framework for understanding the effect of divided attention on task performance." *Id*. The report reaches the following conclusion:

> Given the likelihood that Cowart's tractor trailer moving toward and into the righthand lane of westbound US-72 was perceivable in the moments preceding impact, it is my opinion to a reasonable degree of scientific certainty that driver distraction on the part of Winter contributed to the collision. Available evidence indicates that Winter was interacting with her phone in the seconds prior to impact. Winter's delayed response to the presence of the tractor trailer is consistent with the perceptions and actions of a distracted driver.

*Id*. at p. 5-6.

Winter seeks to exclude Borzendowski's testimony altogether, arguing that "[h]er testimony amounts to a waste of time that would not materially assist the trier of fact since all of her conclusions were adapted by other designated experts in this matter and may be deduced by the jury without the use of her testimony." [81] at p. 5.

14

Winter also directs the Court's attention to a 2020 decision of the District Court for the District of South Carolina in *Koening v. Johnson*, 2020 WL 2308305 (D. S.C. May 8, 2020). In that case, the plaintiffs alleged that they were walking on the sidewalk when the defendant (Johnson) "struck plaintiffs with his vehicle while he was pulling out of a dry cleaner's parking lot and onto the highway." *Id*. at *1. The central factual dispute in the case was "the respective locations of Johnson's vehicle and plaintiffs leading up to and at the time of the accident." *Id*. The district court described the parties' respective positions on that point as follows:

> Johnson has retained an expert who has concluded, based on his 3D modeling of the scene, that the front of Johnson's care was across the sidewalk and in the roadway when plaintiffs crossed in front of it, meaning that plaintiffs had to leave the sidewalk and walk onto Maybank Highway in order to cross in front of Johnson's car. Plaintiffs, conversely, have presented witness testimony and the conclusion of their own expert to show that Johnson's vehicle was stopped short of the sidewalk and that plaintiffs were located on the sidewalk, not the roadway, when they crossed in front of Johnson's vehicle and the accident occurred.

*Id*.

Johnson designated Borzendowski as a human factors expert to testify on his behalf. *Id*. at *7. Borzendowski's report included five different conclusions:

> (1)  Johnson's "gaze behavior" is consistent with a study, which found that younger drivers (aged 25-55 years) are more likely than older drivers to concentrate their glances to the near or far left as they approach an intersection;
>
> (2)  it is possible that when Johnson looked right, his vehicle at least partially obscured his view of the plaintiffs;
>
> (3)  it is possible that the plaintiffs were far enough away from Johnson's vehicle that he did not perceive them to be a potential hazard;
>
> (4)  because eastbound traffic coming from Johnson's left posed the most probably potential hazard, Johnson's behavior was consistent with that of a reasonable driver; and

(5)    because drivers typically expect pedestrians will yield to vehicles rather than placing themselves in the path of a moving vehicle, Johnson would not have expected a pedestrian to walk in front of his vehicle.

*Id*. (quotation marks omitted).

After analyzing the Fourth Circuit's decision in *Scott v. Sears, Roebuck, & Co.*, 789 F.2d 1052 (4th Cir. 1986), the district court wholly precluded Borzendowski from testifying. *Koenig*, 2020 WL 2308305 at *7-8. As to her second and third opinions quoted above, the court emphasized that photographs would be available to the jury and "[d]etermining whether a driver's view is obscured by an opaque object does not require a specialized human factor analysis. The jury is capable of making a common-sense determination of whether Johnson's view was obscured by the A-frame of his vehicle, and that determination will not be aided by Borzendowski's common-sense opinion." *Id*. at *7. The court also noted that "evidence of the parties' respective locations leading up to the accident will be presented to the jury. Analyzing that evidence and determining whether Johnson could see plaintiffs from such a distance is another determination that requires only common sense. Wary of supplanting a jury's independent exercise of common sense, the court excludes the opinions." *Id*. (quotation marks omitted). As to the first and fifth opinions, the court concluded that "[a]lthough Borzendowski supports her opinions with studies in the field of human factors, the jury does not require specialized knowledge to determine that pedestrians will typically not step in front of moving vehicles or that drivers turning right onto a highway generally look in the direction of oncoming traffic." *Id*. at *8. Finally, the court excluded the fourth opinion because it was "nothing more than a common-sense inference on the ultimate issue of the case[.]" *Id*.

Although the Defendants attempt to distinguish *Koenig*, this Court finds the same outcome to be warranted here. As in *Koenig*, the jury in this case will be inundated with evidence pertaining

to the accident. Both parties have designated accident reconstructionists. Evidence regarding cell phone data will be presented. There are photographs and a dash cam video. The Court believes that a jury is fully capable of piecing that evidence together to reach a conclusion as to the respective fault of each party. Borzendowski's human factors analysis and resulting conclusion that Winter was interacting with her phone in the seconds prior to the collision will not assist the jury. The conclusion does not require any specialized knowledge beyond the purview of a lay juror.

In reaching this conclusion, the Court does not doubt Borzendowski's qualifications or the experience that she maintains in this area. Rather, the Court finds, in this particular case, that the testimony will not be helpful to the jury. The Motion [80] is GRANTED.

### V. Defendants' Motion to Exclude Certain Opinions of Tyson Burleson [82]

Tyson Burleson is an accident reconstructionist who Winter has designated as an expert. Burleson has conducted an investigation and prepared a report, wherein he states that his opinions will address "scene, speed, relevant facts of the case, Mr. Tyrin Cowart's ability to operat[e] an 18-wheeler, Ms. Latacia Winter's ability to operate an automobile, and any violations of the Mississippi Rules of the Road and Mississippi statutes, including but not limited to the provisions of Title 63 of the Mississippi Code concerning Motor Vehicles and Traffic Regulations or any other violations of reasonable vehicle operation related to causation." [82], Ex. 1 at p. 11. The report goes on to list 13 separate conclusions—ranging from Cowart's decision to park on the shoulder of the Highway as opposed to at a service station, to Cowart failing to keep a proper lookout, to Cowart's speed at the time of the collision being below the minimum speed limit.

The Defendants concede that some of Burleson's proposed opinions are within the permissible scope of expert testimony but argue that some of them go beyond that scope. They go on to argue that "[t]he types of opinions and testimony that should be excluded are: legal

conclusions, including interpretation of statutes and regulations and whether they were violated, opinions as to what legal duties were placed upon the parties and what 'rights' the parties had or did not have; testimony that is not based on scientific, technical, or other specialized knowledge and opinions the jury can form on its own based on common knowledge and the evidence in this case . . .; and opinions that lack adequate factual grounds, are irrelevant or that are substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury[.]" [83] at p. 2-3. The Defendants then walk through nearly every one of the 13 listed opinions and emphasize portions that they believe should be stricken.

This Court finds persuasive the decision of the District Court for the Southern District of Mississippi in another motor vehicle collision case—*Crechale v. Carroll Fulmer Logistics Corp.*, 2021 WL 3475568 (S.D. Miss. Aug. 6, 2021). There, the plaintiffs designated Burleson as an accident reconstruction expert. *Id*. The defendants sought to strike Burleson's proposed testimony because, according to them, it consisted of impermissible legal conclusions, would not assist the trier of fact, and was not based on sufficient facts or data. *Id*. at *4. The district court rejected the defendants' position, explaining that "[a]ccident reconstruction experts . . . are permitted to give their opinions on . . . how an accident happened, and the responsibility of the parties involved." *Id*. (citing *Hollingsworth v. Bovaird Supply Co.*, 465 So. 2d 311, 314 (Miss. 1985)).

The same outcome is warranted here. Many of the Defendants' arguments are issues that can only be addressed in the context of trial. *See, e.g., King v. Cole's Poultry, LLC*, 2017 WL 532284, at *1 (N.D. Miss. Feb. 9, 2017) (noting that "evidentiary rulings should often be deferred until trial so that questions of foundation, relevancy and potential prejudice can be resolved in proper context.") (citation omitted). For instance, Burleson's opinions that Cowart failed to keep a proper lookout when entering the roadway and failed to yield the right of way are appropriate;

however, it is possible, depending on the questions posed to him at trial, that some of his testimony may be objectionable. That is not a decision this Court can make at this time without considering the full context. Similarly, to the extent that the Defendants contend that Burleson's opinions "lack adequate factual grounds, are irrelevant or [] are substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or [constitute] undue delay, waste of time, or needless presentation of cumulative evidence," the Court finds the same conclusion appropriate. The Court can only make that determination after considering the evidence that has been presented at the time of Burleson's testimony.

The Court will consider objections to Burleson's testimony at trial and, if necessary, will do so outside of the presence of the jury. For purposes of the present filing, the Motion [82] is DENIED.

VI.     *Defendants' Motion to Exclude Certain Opinions of Kenneth Goodrum [86]*

Kenneth Goodrum is another accident reconstructionist who Winter designated as a retained expert. In his report, Goodrum explains the inspection that he undertook and then articulates 21 opinions. Goodrum's opinions are similar to those of Burleson—he concludes that Cowart failed to keep a proper lookout, failed to yield the right of way, and failed to comply with the Federal Motor Carrier Regulations, among others.

The Defendants' opposition to Goodrum's opinions essentially mirrors their opposition to Burleson. In fact, many of the arguments set forth in their Memorandum [87] are identical to the arguments set forth in opposition to Burleson. The same conclusion is appropriate. Goodrum's opinions will not be altogether excluded at this time. Instead, the Court will consider objections to

the testimony in the context of trial when questions of foundation and relevancy can be considered. *See King*, 2017 WL 532284 at *1 (N.D. Miss. Feb. 9, 2017).[2]

Other than Winter's concession as to Goodrum's opinion pertaining to vicarious liability, the Motion [86] is DENIED.

VII.    *Plaintiff's Motion to Exclude or Limit Testimony of Terry Reynolds [88]*

The Defendants designated Terry Reynolds as an accident reconstructionist who "has extensive education, training, and experience in the fields of accident investigation, accident reconstruction, vehicle dynamics, and heavy vehicle performance." [78], Ex. 1 at p. 4. Reynolds' report includes seven different conclusions.

In his Memorandum [89], Winter attacks Reynolds' opinions on multiple fronts. First, he argues that "Reynolds lacks the qualifications to provide expert testimony." [89] at p. 5. Winter avers that Reynolds "formed his opinions without employing a reliable methodology or principles that are supported in science." *Id*. at p. 6.

This argument is easily rejected. The Court has reviewed Reynolds' curriculum vitae. He has an extensive background in accident reconstruction and has provided expert testimony in numerous state and federal court cases. He reached his conclusions utilizing his experience and training and considering the data available in this case. The Court rejects Winter's argument to exclude Reynolds on qualification grounds.

As to Reynolds' substantive conclusions, Winter argues that (1) "Reynolds' opinion that Latacia Winter was a distracted driver is based solely on Joshua Lorencz's report and is therefore inadmissible;" (2) "Reynolds should not be allowed to testify that speeding was a direct or

---

[2] In reaching this conclusion, the Court notes that, in his Response Memorandum [108], Winter concedes that one opinion (Opinion No. 3) will be withdrawn. That opinion, which relates to vicarious liability, will be excluded in light of the Defendants' stipulation that DT Freight is vicariously liable for any negligence attributable to Cowart.

proximate cause of the subject collision;" and (3) "Reynolds should not be allowed to offer testimony regarding the adequacy of the lighting in the area, or the adequacy of the vehicle's safety features and lighting." [89] at p. 6-11. The Court will address these opinions in turn.

Concerning Reynolds' opinion that Latacia Winter was a distracted driver, Winter's position is that Reynolds' conclusion is simply a recitation of Lorencz's conclusion. In his deposition, Reynolds testified that "I am not a cell phone expert, so I defer to [Lorencz's] decision and his characterization of that." [88], Ex. 2 at p. 11. Despite this admission, the Court is unable to conclude, at this stage of the proceedings, that Reynolds should be precluded from testifying on this topic altogether. Although the Court can undoubtedly envision questions that would require Reynolds to provide speculation, it is possible that some questions related to Winter's conduct may be appropriate. Therefore, rather than issuing a definitive ruling at this time, the Court will defer until trial so that the matter can be considered in context. *See King*, 2017 WL 532284 at *1.

Next, Winter contends that Reynolds should be precluded from testifying that speeding was "a direct or proximate cause of the subject collision." [89] at p. 10. To support this argument, Winter cites Reynolds' deposition testimony:

> Q.    Okay. And the basis for that was you found that the cruise control was engaged; is that correct?
>
> A.    Yes. The cruise control was engaged.
>
> Q.    Okay. But you didn't render an opinion, is this correct, that speed was a contributing cause of the wreck; is that correct?
>
> A.    Not directly, no, sir.
>
> . . .
>
> Q.    She was doing 70 in a 65, correct?
>
> A.    That is correct.

> Q.   And, because you provided no opinion that says that speed was the cause of the wreck in this report, you're not going to do that at trial, correct?
>
> A.   No, sir.

[88], Ex. 2 at p. 6.

Although it may be appropriate for Reynolds to testify at trial as to the respective speed of the vehicles prior to the collision, the Court finds that he should be held to his representation that he will not render an opinion that speed was the cause of the wreck. In reaching this conclusion, the Court notes that the Defendants did not respond to this argument in their Response Memorandum [106]. *See*, *e.g.*, *Black v. N. Panola Sch. Dist.*, 461 F.3d 584, 588 n. 1 (5th Cir. 2006); *see also* L. U. Civ. R. 7(b)(3)(E) ("If a party fails to respond to any motion, other than a dispositive motion, within the time allotted, the court may grant the motion as unopposed."). Winter's request as to this particular opinion is GRANTED.

Lastly, Winter contends that Reynolds should not be permitted to testify as to the adequacy of the lighting in the area or the adequacy of the tractor trailer's safety features and lighting. In his deposition, Reynolds testified that he did not do any testing as to lighting in the area and "did not have a chance to examine" the rear lights on the tractor trailer. [88], Ex. 2 at p. 19. In light of Reynolds' own admissions, he will not be permitted to provide any testimony on the adequacy of the lighting in the area or the adequacy of the tractor trailer's safety features and lighting. Winter's request as to this proposed area of testimony is GRANTED.

Reynolds will be permitted to testify at trial subject to the limitations set forth herein. The Motion [88] is GRANTED IN PART AND DENIED IN PART.

*VIII.    Plaintiff's Motion to Exclude or Limit Testimony of Eric Speer [92]*

The Defendants also designated Eric Speer, a mechanical engineer, as an accident reconstructionist. In his report, Speer states that "[t]he main objective of this investigation is to reconstruct the circumstances of the collision between Mr. Cowart's tractor-trailer and Ms. Winter's Chrysler and evaluate Ms. Winter's Chrysler's avoidance capabilities." [92], Ex. 1 at p. 2. The report then explains the efforts undertaken to achieve that objective, such as an evaluation of the impact area, inspection and imaging of the vehicles involved in the collision, a review of the pre- and post-collision data from the vehicles, and a review of video footage from the tractor-trailer's windshield, among others. At the end of the report, Speer sets forth extensive conclusions:

11.    Based on the electronic data imaged from Ms. Winter's Chrysler:

    a.    Ms. Winter was traveling at a constant speed of 70 mph with the cruise control engaged for the five seconds prior to impact;

    b.    Ms. Winter never applied the brakes in the five seconds prior to impact;

    c.    Ms. Winter began slowly steering to the left approximately 0.4 seconds prior to impact;

    d.    Ms. Winter was wearing her seatbelt at the time of impact;

12.    Based on the electronic data imaged from Mr. Cowart's tractor-trailer:

    a.    Mr. Cowart began accelerating his tractor-trailer from a stopped position for approximately one minute and 594 feet prior to reaching its final rest position;

    b.    Mr. Cowart was accelerating his tractor-trailer for approximately 31 seconds where he reached a top speed of 17.4 MPH when he subsequently began to apply the brakes approximately 242 feet prior to final rest;

    c.    Mr. Cowart was accelerating his tractor-trailer for 352 feet at an approximate acceleration rate of 0.026 g's or 0.82 ft/s$^2$;

    d.    This one-minute span of motion is consistent with Mr. Cowart's motion from a stopped position under the Good man Road underpass to his final rest position following impact[.]

*Id*. at p. 30-31.

Speer then provides additional opinions as to the location of the vehicles at certain times leading up to the collision. He also provides an avoidance analysis, wherein he provides opinions as to the amount of time/distance that Winter would have had to apply her brakes or initiate a turn of the steering wheel to avoid the collision and how those numbers would have changed if she had been driving 65 mph (the posted speed limit) as opposed to 70 mph.

Winter seeks to exclude or limit Speers' testimony. Winter contends that Speer "lacks the qualifications to provide expert testimony" and that Speer's "opinions about 'avoidance analysis' should be excluded." [93] at p. 6.

As to the first argument, the Court easily rejects it. Speer's curriculum vitae indicates that he possessed a bachelor's degree in mechanical engineering and is a licensed professional engineer in four states. The report itself clearly sets forth the methods Speer utilized to reach his conclusions. Winter's conclusory contentions that Speer lacks qualifications is unavailing.

Concerning Speer's avoidance analysis opinions, Winter argues:

> Speer's testimony about Winter driving 70 mph in a 65 mph zone is not relevant to the facts and issues of this case and will not assist the jury to understand the evidence or determine a fact in issue. Additionally, his presentation of the different driving speeds as an "avoidance analysis" scenario has the effect of presenting evidence to the jury that is otherwise irrelevant and prejudicial. It is also an attempt to improperly shift fault form the Defendants to Plaintiffs.

[93] at p. 7.

This argument is also rejected. The Court struggles to grasp how the speed of the vehicles at the time of the collision would not be critically important to understand the underlying facts and how the collision occurred. Similarly, Speer's opinions as to how differing speeds might impact

the amount of time that Winter had to react is certainly relevant. Winter's arguments to exclude Speer's avoidance analysis opinions are rejected. The Motion [92] is DENIED.

*Conclusion*

For the reasons set forth above, the Motions are disposed of as follows: the Motion to Exclude Joshua Allen [72] is DENIED; the Motion to Strike Joshua Lorencz [78] is DENIED; the Motion to Exclude or Limit Testimony of Stephanie Borzendowski [80] is GRANTED; the Motion to Exclude Certain Opinions of Tyson Burleson [82] is DENIED; the Motion to Exclude Certain Opinions of Kenneth Goodrum [86] is GRANTED IN PART AND DENIED IN PART; the Motion to Exclude or Limit Testimony of Terry Reynolds [88] is GRANTED IN PART AND DENIED IN PART; the Motion to Exclude Opinions of Kyle Wood [90] is DENIED; and the Motion to Exclude or Limit Testimony of Eric Speer [92] is DENIED.

SO ORDERED, this the 15th day of November, 2024.

/s/ Sharion Aycock
UNITED STATES DISTRICT JUDGE